57 CCPA

**H. & S. ORIGINALS, Appellant,**

v.

**The UNITED STATES, Appellee.**

**Customs Appeal No. 5318.**

United States Court of Customs and Patent Appeals.

Dec. 4, 1969.

Barnes, Richardson & Colburn, New York City, attorneys of record, for appellant. Hadley S. King, Norman C. Schwartz, David O. Elliott, New York City, of counsel.

William D. Ruckelshaus, Asst. Atty. Gen., Andrew P. Vance, Chief, Glenn E. Harris, New York City, for the United States.

Before RICH, Acting Chief Judge, JONES, Judge, sitting by designation, and ALMOND, BALDWIN and LANE, Judges.

BALDWIN, Judge.

This appeal is from the judgment of the United States Customs Court, Second Division, Appellate Term,[1] reversing the judgment of the trial judge[2] in 76 appeals for reappraisement.

The imported merchandise consists of various items of beads and costume jewelry manufactured by a number of different companies in Japan and exported between October 31, 1961, and April 14, 1964. It is undisputed that export value, as defined in section 402(b) of the Tariff Act of 1930 as amended by the Customs Simplification Act of 1956, T.D. 54165,[3] is the proper basis for appraisement.

The merchandise was purchased by the importer, H. and S. Originals (hereafter H & S), through a buying agent, Sanyei Corporation of Japan, which dealt with the manufacturers. The imported items in the various entries were entered at unit prices, purported to be "ex-factory" prices, set out in commercial invoices prepared by Sanyei. Those invoices additionally showed the amount of an alleged buying commission of 8 percent, various inland charges and the sums of all costs set out as the full f. o. b. Japan invoiced costs. The appraiser fixed the export value at the invoice unit prices plus percentages, varying from entry to entry, averaging about 2.3 percent.

The trial judge first agreed with the importer that the appraisements are "separable" and that its challenge is properly limited "to the correctness of the percentage additions made by the appraiser." He further ruled that the appraised values were erroneous because they allowed some but not all of the "8 percent buying commission or of the invoiced other inland charges," leaving the invoice unit price of each item in each entry as the correct export value. The three judges of the appellate term reversed, taking the view that the evidence did not show the appraised values to include any non-dutiable charges or the invoice prices to be the actual prices paid to the manufacturer in Japan.

1. United States v. H & S Originals, 60 Cust.Ct. 950, A.R.D. 236.

2. H & S Originals v. United States, 57 Cust.Ct. 704, R.D. 11244.

3. (b) *EXPORT-VALUE*.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Turning to the evidence, that introduced by the importer, H & S, includes an agency agreement between it and Sanyei (exhibit 1); a number of exhibits (exhibits 2–20) generally including purchase orders of H & S and corresponding Sanyei acceptance notes relative to transactions taken as representative of those involved here, with the latter purporting to include the counter-signatures of representatives of the respective manufacturers; two affidavits of H. Watanabe, managing director of Sanyei, identified as exhibits 22 and 23; and testimony of Henry Falkenstein, import manager of H & S, and Joel Margulies, the line examiner who advisorily recommended to the appraiser the appraised values adopted for the merchandise at bar. Also in the record are the commercial invoices for representative appeals. The government introduced in evidence two customs agent's reports, exhibits A and B, and an affidavit of the president of Kyoei Boeki Co., Inc. (Sanyei) dated March 29, 1962, exhibit C.

The agency agreement between H & S and Sanyei, which was known as Kyoei Boeki Co., Inc., and also did business as Nakanishi & Co., provided that Sanyei would act as agent for H & S to place orders at ex-factory prices and that H & S would pay Sanyei a buying commission amounting to 8 percent of such price and reimburse Sanyei for all inland charges to the shipping port.

The invoices are all similar to that in appeal R64/12317, which includes the appraiser's notation:

All items appraised at invoiced unit values plus 2.3% pkd.

The invoices in the other appeals included like notations with the percentage added varying between 1.3 percent and 2⅞ percent.

In the affidavit constituting exhibit 22, Watanabe, managing director of Sanyei, alleges that the invoices of his company truly set forth the actual "ex-factory" prices and other charges incurred. In his second affidavit, submitted in evidence at a later session of the trial than was the first, Watanabe states that the sellers here did not sell at ex-factory prices but that prices included transportation and insurance (if any) to the agent's warehouse in Osaka. He also stated that "currency fluctuations and occasional inaccuracies in figuring" must be taken into account in connection with the accuracy of the invoices.

The government's exhibit A, a customs agent's report dated March 30, 1962 pertains to an interview of Shigeo Shimada, owner of Sanyei's predecessor, Kyoei Boeki. Shimada related that final prices from manufacturers "always include export case and packing, delivery to warehouse, Osaka, or warehouse or pier, Kobe."

Exhibit B is a report under the same date of the same agent reflecting an interview of Minoru Kawai, president of Senshin Pearl Kogyo K. K. on January 31, 1962. The affidavit states that Kawai stated that Kyoei Boeki (Sanyei) buys from Senshin as agent for United States importers usually not known to Kawai. It also sets out that Kawai stated that the merchandise is always delivered either to the buyer's or shipper's warehouse in Osaka or Kobe or to the pier at Kobe at the originally negotiated price.

Exhibit C is an affidavit executed March 29, 1962 by Kunio Izumi, president of Kyoei Boeki, who states that his company is "also known as the Sanyei Corporation." He explains that imitation pearl jewelry manufacturers sell the merchandise at prices which include delivery to the Kyoei Boeki Co., Inc., Osaka Warehouse. Izumi further states:

Kyoei Boeki Co., Inc., separately negotiates with United States importers ex-factory prices, such ex-factory prices being the only prices known to United States importers and which prices may or may not be the same as the delivered prices negotiated with manufacturers * * *.

The witness Falkenstein identified the agency agreement with Sanyei and the purchase orders and acceptance notes of exhibits 2 through 20. However, he testified that he had no part in the purchase of any of the items at bar. He also conceded that he had no personal knowledge of any agreement between his company and the makers or sellers or as to where any of the merchandise was delivered in Japan.

The line examiner, Margulies, would agree only that the "effect" of his recommended appraisements of the imported items at varying percentages of advance over the invoiced prices was to arrive at "full f. o. b. cost less 7 per cent." He did state that the appraisements were based upon "such" merchandise under section 402(b). Margulies further testified that, when he made his recommendations regarding the appraisements in issue, he had before him various foreign reports dealing with the entire industry in Japan, and that he also had knowledge of the industry in Japan from having seen documents such as orders and agency agreements and from conversations with importers. He stated that he had recommended that the appraiser not accept the alleged ex-factory prices or the amounts of various inland charges and buying commissions appearing on the invoices, because he was of the opinion that such amounts were not correct. According to Margulies, the appraised values recommended by him and adopted by his superiors were intended to represent the freely offered prices of the manufacturer or seller on a delivered basis (delivered to the shipper's warehouse), without buying commissions and inland charges.

In reversing the trial judge, the appellate term concluded that the record lacked evidence sufficient to rebut the presumption of correctness attaching to the appraisements. It specifically found as a fact that "the importer adduced no competent, persuasive or substantial evidence that * * * [the] percentage additions [made to the entered values by the appraiser] included a buying commission or part thereof, or any non-dutiable inland charges."

The appellate term found that the "testimonial" evidence of record does not support the contention of H & S as to dutiable value. Thus, it recognized that the witness Falkenstein lacked personal knowledge of details at the initial or primary level of transactions in Japan involving merchandise the same as or similar to that at bar. It considered the testimony of Margulies to make it clear that "appraisement of the involved merchandise was undertaken with a view toward returning an export value based on a 'delivered price' inclusive of inland charges to the point of delivery." The appellate term further found that the actual outlays incurred for inland charges and buying commissions became "a casualty of the value finding process to the extent that the 'delivered prices' returned by the appraiser overlapped the unit prices on which actual outlays for inland charges and buying commissions were calculated by the parties." It was also its view that the record does not bear out that the appraiser undertook to include in the involved export values non-dutiable inland charges or a buying commission. The appellate term further noted that the agent's reports constituting exhibits A and B and the affidavit designated exhibit C were in existence at the time of the appraisements and found them to support the existence of a delivered price as opposed to an ex-factory price. It then reasoned:

> * * * What the case comes down to, then, in view of evidence from all accounts that the Japanese manufacturers added to their prices their costs in moving the merchandise from the factory to the point of delivery, is whether the unit prices in dollars reflected in the invoices given at the secondary level of transactions in Japan (invoices covered by the involved appeals) are the same as the purchase prices in yen passing between the manufacturers and the buying agent at the primary level of transactions in Japan. If the comparative

prices are not the same, then the action of the appraiser in adding charges to the first cost prices would seem to be correct and proper. And on the other hand, if the comparative prices are the same, then the appraiser's action would seem to be in error in adding anything to the unit prices. * *

Observing further that the agency agreement mandates that "ex-factory prices" are to be the standard for calculating commissions, the appellate term was of the opinion that the endorsements or counter-signatures of the Japanese manufacturers on the documents in exhibits 2–20, if they prove anything at all, "indicate only the actual ex-factory prices which furnished the basis for the calculations of buying commissions." It stated that those documents do not add anything to the proof of the components of a delivered price, "which we must ultimately find to exist or not to exist in the same amounts as the 'ex-factory price' these documents reflect."

In reaching its ultimate conclusion, the appellate term reasoned as follows:

> More to the point on the matter of the components of the "delivered price" are the affidavits received in evidence as plaintiff's exhibits 22 and 23 and defendant's exhibit C. Here we note that the tenor of paragraph 6 of exhibit 23 is that the "ex-factory price" and the "delivered price" is the same, while the tenor of paragraph 3 of exhibit C is that the "ex-factory price" and the "delivered price" "may or may not be the same."

> The trial court did not give any weight to exhibit C or the foreign reports contained in exhibits A and B, and elected to credit the recitals of exhibit 23. While we recognize the prerogative of a trier of the facts in reappraisement proceedings to accept evidence contained in affidavits over that contained in foreign reports with respect to disputed issues of fact, nevertheless preferential treatment of the strata of evidence would not warrant giving no weight to exhibit C

which, qualitatively speaking, is on a parity with exhibit 23 and which, on this essential matter, is at odds with exhibit 23. As between the two exhibits we are inclined to believe that exhibit C possesses greater probative value than exhibit 23. At the very least exhibit 23 is offered at the risk of exposing a contradiction on some points by the affiant over his former sworn statements in exhibit 22 on the matter of pricing policies of the Japanese manufacturers.

> Furthermore, exhibit C emanates from Sanyei's president who professes to have had a hand in formulating the pricing arrangements of his company. On the other hand, exhibits 22 and 23 were executed by Sanyei's managing director who does not aver personal participation in the pricing arrangements, but who predicates his knowledge of the situation solely upon his position with the company as managing director. Then too, we note that the distances of the Japanese factories from the place of delivery in the city of Osaka (as shown on the confirmations placed in evidence by the appellee) vary, with the factories being located both within and without the prefecture of Osaka. This situation, it seems to us, lends credence to the statement contained in exhibit C to the effect that the disputed prices may or may not be the same. It is quite conceivable to us that a quotation of an "ex-factory price" from a Japanese manufacturer whose plant is located in the same city where the buying agent's warehouse is located might be the same as a quotation of a "delivered price" emanating from the same manufacturer. However, it is quite another thing to suggest to us that a "delivered price" quotation from a manufacturer located in the suburbs of Osaka city or a more distant place from the warehouse where delivery is to be effected would be the same as its "ex-factory price." In any case, we are of the opinion that the probative value of exhibit 23, if not cancelled

out by contradictory statements in exhibits 22, is outweighed by conflicting statements in exhibit C stemming from the same general source. And our view as to the lack of probative value of exhibit 23 leaves the record devoid of any "documentary" evidence tending to rebut the presumption attaching to the appraisements herein.

The appellate term's reasoning may be summarized in two points. First, the evidence does not prove that the appraiser included any of the invoiced 8 percent buying commission or invoiced other inland charges in the appraised value. Second, the record does not establish that the "ex-factory" unit values set out in the invoices prepared by the agent actually were the same as the "delivered" (to warehouse) prices at which the merchandise was actually sold by the manufacturer. Recognizing the presumption of correctness that attaches to the appraiser's action [4] and the dual responsibility of the importer in challenging that action,[5] we are convinced that we would not be justified in holding that the record lacks substantial evidence to support the view of the appellate term that the appraised values are the correct values here.[6]

Accordingly, the judgment is affirmed.

Affirmed.

4. 28 U.S.C. § 2633 provides in pertinent part:

The value found by the appraiser shall be presumed to be the value of the merchandise. The burden shall rest upon the party who challenges its correctness to prove otherwise.

5. In United States v. Baar & Beards, Inc., 46 CCPA 92, C.A.D. 705 (1959), the court stated:

It is too well established to require citation that if the action of a collector, or, as in this case, an appraiser, is challenged, the importer thereupon assumes the dual obligation of proving the challenged action wrong, and the importer's contentions correct.

6. We have not overlooked the fact that the appellant term held, as did the trial judge, that the appraisements herein are "separable" and that the government argues vigorously against such holding. However, we find it unnecessary to, and do not, rule on that matter.